IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| DARYL K. BURNS, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 6:15-cv-02332-LSC |
| ALABAMA POWER | ) ) | |
| COMPANY, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF OPINION**

Plaintiff Daryl K. Burns ("Burns") brought this action against his former employer, Alabama Power Company, d/b/a Gorgas Steam Plant ("Alabama Power"), alleging claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981. Before this Court is Alabama Power's Motion for Summary Judgment. (Doc. 19.) For the reasons stated more fully herein, the motion is due to be granted.

## I.    BACKGROUND[1]

---

[1] In ruling on a motion for summary judgment, this Court views the facts "in the light most favorable" to Burns and "constru[es] all reasonable inferences in his favor." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1092 (11th Cir. 2014).

Burns began his employment with Alabama Power on October 7, 2013, as a Plant Auxiliary ("PA") at Plant Gorgas. He was one of four black PAs who began working at Alabama Power in October and November 2013. During the PAs' multi-day orientation program, the plant's Scheduler, Julia Hester ("Hester"), who is white, trained the newly hired PAs about proper completion and submission of their timesheets. Hourly employees, such as PAs, manually completed paper timesheets for each biweekly pay period, which the employees were required to submit to Hester or to their Team Leader of Operations ("TLO"). Newly hired PAs generally printed out their timesheets and placed them in a binder in their training classroom. The training instructor was supposed to review the PAs' timesheets for accuracy before signing them, and Hester would take the timesheets from the binder to enter the employees' hours. Hester explained to the PAs that if they needed help filling out their timesheets, they could seek help from her, their supervisors, their classroom instructor, or anyone in management. On October 8, 2013, Burns completed a computer-based training program that informed him of Alabama Power's policy that falsification of timesheets "will result in immediate discharge."

PAs, as new employees, occasionally made errors on their timesheets. For example, because Plant Gorgas used a timesheet that required its employees to use

pay codes that corresponded with their hours worked, PAs would mistakenly leave a nightshift code on their timesheets after being switched to work dayshift. Generally, if a PA made a mistake on his timesheet, Hester would notice the discrepancy while entering the employee's time. She would then contact the TLO on shift at the time the employee was scheduled to work in order to determine whether the employee's schedule had been changed. If it had not been changed, the TLO or Hester would contact the employee about the discrepancy, and the employee would immediately correct the mistake and initial the correction. According to Burns, his co-workers Jon Robinson ("Robinson"),[2] Nate Ford ("Ford"), and Cruz Hyche ("Hyche"), who are all white, were permitted to correct timesheet errors of some kind during the time Burns worked at Alabama Power.

In January 2014, Plant Gorgas was actively engaged in freeze protection due to severe weather conditions, so the PAs were frequently asked to work overtime to keep the plant running during the inclement weather. On Sunday, January 5, 2014, the TLOs on shift called out some of the PAs to work overtime for freeze protection. Burns was not called out, and he complained to Hester the next day

---

[2] There is some confusion in the record as to whether the individual allowed an opportunity to correct his timesheet was Robinson or another PA named Joe Robertson ("Robertson"). Because both are white, the distinction is immaterial.

about the way the callout was handled. He asked Hester to explain the overtime callout procedure to him because he felt that there was some "favoritism" and a "buddy system," since he was the most senior PA and was not called out. According to Burns, he also told Hester that all of the employees called out on January 5 were white, and that the TLOs "could have called some of the black employees."

Some aspects of Burns's position as a probationary PA were covered under a collective bargaining agreement ("CBA") between Alabama Power and the International Brotherhood of Electrical Workers (the "Union"). Hester explained to Burns that the CBA required Alabama Power to distribute overtime opportunities equally over a one-year period, and although the most senior employees typically receive overtime before other employees, the inclement weather that weekend constituted "extenuating circumstances" that necessitated deviation from the standard procedures. Hester told Burns that she would "look into" the callout and get back to him, but she did not inform the plant's management of Burns's complaint.

On Monday, January 6, and Tuesday, January 7, 2014, Burns was held over after the end of his regular shift and worked four hours of overtime each day. On Wednesday, January 8, 2014, Hester called Burns to work overtime shortly after his

regular shift ended, but Burns did not respond to her call and did not report back to work that afternoon. Six days later, on January 14, 2014, Burns completed his timesheet for the pay period beginning January 4, 2014, in the training room with other PAs present. According to PA Tyler Pate ("Pate"), who is white, Burns asked the other PAs who the TLO on shift was for the evening of January 8, 2014. Although Burns did not work overtime on January 8, he submitted a timesheet that reported four hours of overtime worked on that day.

On January 14, 2014, the same day the new PAs completed their timesheets together, a Plant Control Operator ("PCO") telephoned Plant Gorgas's Operations Manager, Hal Miller ("Miller"), who is white, and informed him that several PAs had reported that Burns had falsified his timesheet. Miller intended to speak with Hester about the allegation the following morning, but before he could do so, some of Burns's classmates, including Pate, notified Hester that Burns had recorded unworked overtime on his timesheet. Because Pate knew that Burns did not work overtime on January 8 but had overheard Burns ask about the TLO on shift that day while the new PAs were completing their timesheets, Pate told Hester that she should review Burns's timesheet. Hester notified Miller, her supervisor, on January 15, 2014, of the allegation that Burns had falsified his timesheet.

The plant's management directed Hester to send an email to all the PAs asking them to verify the overtime they had worked during the pay period beginning January 4, 2014. Hester sent the email on January 15, 2014, and asked the PAs to respond with the overtime hours that they worked the previous week and the name of the TLO who called them out or held them over.[3] In his reply to Hester's email, Burns stated, "1/08/14 TLO Mike Franks," which was consistent with the timesheet he had submitted. Once she had received all of the responses, Hester turned them over to Miller and did not have any subsequent discussions with management regarding Burns's timesheet. Hester was not otherwise involved in the investigation of the allegations against Burns, nor did she participate in the decision to terminate his employment.

Because Burns reported in the email to Hester that he worked overtime on January 8, 2014, when he had not worked overtime on that day, Miller and the plant's Human Resources Business Consultant, Michael Gilland ("Gilland"), who

---

[3] In relevant part, the email reads as follows:

> Due to the inclement weather during this pay period, there were several call-outs and employees held over or employees that came in early to assist us with freeze protection and unit issues.

> To ensure that I have all your hours down, please send me an email by noon today for all day shift employees and by 06:30 hrs tomorrow for all night shift employees to tell me if you worked any hours outside of your normal 8-hour schedule to make sure I get it all keyed in accurately. Please add the names of the TLO that called you out or held you over.

is black, called Burns into Miller's office for a meeting on January 16, 2014. During the meeting, which Burns characterizes as "adversarial," Miller and Gilland asked Burns several times if his timesheet was correct, and each time Burns responded that it was. At one point, Burns stated that he was sure he worked overtime on either Wednesday, January 8, or Thursday, January 9, 2014. When Miller informed Burns that no one worked overtime on January 9, Burns answered that he must have worked overtime on January 8. Toward the end of the meeting, Miller and Gilland informed Burns of the error on his timesheet, and Burns attempted to correct the timesheet as soon as he realized he had made a mistake. Burns was placed on administrative leave with pay pending Miller and Gilland's investigation into the matter.

After Miller and Gilland concluded their investigation, they provided Plant Manager Susan Mayfield ("Mayfield"), who is white, with Burns's timesheet, the gate logs showing the times Burns entered and left the plant, Hester's January 15 email to the PAs and Burns's response to that email, and a summary of the January 16 meeting, as well as "a complete summary of the information they had regarding Burns." Based on this information, the plant management believed that Burns had committed a serious violation of company policy by falsifying his timesheet. Pursuant to the CBA, a probationary employee such as Burns could not be placed

on any formal disciplinary level below termination, so Mayfield, after consulting with the Union, the company's Vice President of Operations, and individuals in Human Resources and Labor Relations, decided to terminate Burns's employment. Burns was terminated on January 23, 2014, at a meeting with Miller, Gilland, and a Union representative.

Following his termination, on January 24, 2014, Burns filed a formal Concern through Alabama Power's Concerns Program, alleging that he was wrongfully terminated. Burns alleged neither race discrimination nor retaliation in his intake form or in his final written statement. After an investigator concluded that there was "no information to support" the Concern, Burns appealed the finding on May 27, 2014. Although he spent two months drafting the appeal, Burns did not reference race discrimination or retaliation in any written document he submitted as part of the appeal. A different investigator concluded that the appeal was likewise unsubstantiated and that Burns's termination "was based upon company policy."

## II.  STANDARD OF REVIEW

A motion for summary judgment is due to be granted upon a showing that "no genuine dispute as to any material fact" remains to be decided in the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A genuine dispute as to a material fact exists where "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. DISCUSSION

Title VII prohibits, among other conduct, "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).[4] Absent direct evidence of racial discrimination, such as specific statements made by the employer's representatives, a plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1335 (11th Cir. 2015); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5] Under this

---

[4] Because Title VII and § 1981 "have the same requirements of proof and use the same analytical framework," this Court addresses Burns's claims only as to Title VII, "with the understanding that the analysis applies to the § 1981 claim[s] as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008).

[5] Because Burns has not offered any direct evidence of discrimination, this Court addresses his claims under the standards applicable to circumstantial evidence of discrimination. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

framework, the aggrieved employee creates a presumption of unlawful discrimination by first establishing a prima facie case of discrimination. *Flowers*, 803 F.3d at 1336 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254). "[T]he burden then shifts to the employer to produce 'a legitimate, nondiscriminatory reason' for the action taken against the plaintiff." *Id.* (citing *Burdine*, 450 U.S. at 254). If the employer proffers a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the employer's reason is a pretext for unlawful discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). Ultimately, "[t]he critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

## A. Race Discrimination Claims

### 1. Prima Facie Case

To establish a prima facie case of racial discrimination, the plaintiff employee must demonstrate that (1) he belongs to a racial minority; (2) he was subject to an adverse employment action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to perform the job. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

Alabama Power contends that Burns has failed to identify a similarly situated comparator who was treated more favorably. Burns, for his part, does not appear to dispute Alabama Power's assertion that he cannot identify a comparator. However, Burns's "failure to produce a comparator does not necessarily doom [his] case." *Smith*, 644 F.3d at 1328. A plaintiff who fails to identify a comparator—and thus fails to create a presumption of racial discrimination under *McDonnell Douglas*— may nonetheless proffer other circumstantial evidence "that creates a triable issue [of fact] concerning the employer's discriminatory intent" in order to withstand an employer's motion for summary judgment. *Id.* "A triable issue of fact exists if the record, viewed in [the] light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (internal footnote omitted).

2. "Convincing Mosaic" of Circumstantial Evidence

To prove his race discrimination claims, Burns attempts to rely on the "cat's paw" theory of liability, which imputes to an unbiased decisionmaker the acts of a supervisor that were "motivated by [discriminatory] animus" and "intended . . . to cause an adverse employment action," if such acts are the "proximate cause of the ultimate employment action." *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis deleted). Burns argues that Hester and Miller harbored a racially

discriminatory animus toward him and that their actions contributed to Mayfield's decision to terminate his employment. Specifically, Burns claims that Hester "had a motive to discriminate" against him because she "failed to take any action to address his complaints of race discrimination in the assignment of overtime" and "routinely allowed white hourly employees to correct [their] time sheets." Burns also takes issue with the manner in which Hester and Miller dealt with the allegations that Burns had falsified his time sheet.

With respect to Burns's complaint to Hester that Alabama Power "appeared to be favoring white employees" by offering them overtime, Burns provides no evidence substantiating an inference of racial discrimination in Hester's response. Although Hester did not inform the plant's management that Burns had complained about the January 5 overtime callouts, Burns testified that the overtime holdovers or callouts later that week were conducted properly. He worked overtime on January 6 and January 7, and Hester called him out to work overtime on January 8, but Burns did not answer his phone or return to work. It is unclear what else Hester could have done to address Burns's complaint that others were offered overtime and he was not, since he was offered overtime at each available opportunity after meeting with Hester. Further, there is no indication that Hester intentionally declined to inform the plant's management of Burns's complaint, or

otherwise failed to address it, in an effort to have Burns fired. Burns has thus shown neither that Hester was "motivated by [discriminatory] animus" or that she intended her conduct to cause an adverse employment action, as is necessary for "cat's paw" liability. *See Staub*, 562 U.S. at 422.

But Burns's principal argument is that he was treated differently from other employees who had also made errors on their timesheets. First, Burns contends that Hester should have notified him of the discrepancy and given him an opportunity to correct it. He identifies three white employees whom he alleges were permitted to correct mistakes and claims that he should have been allowed to do so before being terminated. Hester affirmed that if she noticed a discrepancy on a PA's timesheet, she would ask the TLO if the PA's schedule had been changed, and then she or the TLO would notify the PA about the mistake. There is no dispute that Hester did not do so in Burns's case. Indeed, Mayfield testified that Burns's situation was addressed differently due to the allegations that he had falsified his timesheet. Burns is, to Hester's knowledge, the only employee during her eight-year tenure as the plant's Scheduler to have been accused of submitting a timesheet with unworked overtime hours. For this reason, Burns is unlike the white co-workers whom he claims also made a mistake on their timesheets. *See Johnson v. Miller Brewing Co.*, 341 F. App'x 477, 478 (11th Cir. 2009) (per curiam) ("A

plaintiff is similarly situated to another employee only if the 'quantity and quality of the comparator's misconduct' are 'nearly identical.'" (quoting *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006))). Thus, the fact that Hester did not notify Burns of the discrepancy does not warrant an inference of racially discriminatory animus. *See Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("If two employees are not 'similarly situated,' the different application of workplace rules does not constitute illegal discrimination.").

Next, Burns argues that Hester and Miller "initiated an investigation" to target him, when they should have investigated the employees who reported Burns for falsifying his timesheet in order to determine whether those employees complained "in good faith." Burns has not presented any evidence that Pate or the other PAs did not honestly suspect that Burns had put unworked overtime hours on his timesheet or that an inquiry into these employees' motives would have indicated that the complaints were made in bad faith. In fact, Burns did—whether intentionally or unintentionally—record unworked overtime hours on his timesheet. Therefore, even if Hester or Miller had attempted to verify that Pate and the other employees acted in good faith in reporting Burns, Burns does not dispute the truth of these employees' allegations that his timesheet included four

hours of overtime that he did not work. Instead, he disputes the conclusion made by Miller, Gilland, and Mayfield that the timesheet was falsified and the four hours were not added mistakenly.

Additionally, Burns claims that Hester and Miller intentionally excluded Gilland, the only black employee involved in the investigation process, from many aspects of the investigation. There is no merit to this argument. Gilland testified that Miller came to him on January 15, 2014, and informed him of the allegations against Burns, and that together they decided to send an email to the PAs about their overtime hours the previous week. Gilland read the PAs' responses to these emails and, along with Miller, met with Burns the following day. Gilland also stated that he continued to participate in the investigation after the January 16 meeting by interviewing one of Burns's co-workers and discussing his conclusions with Miller and Mayfield. Given these facts, it can hardly be said that Gilland was excluded from the investigation.

But Burns takes issue with the fact that Gilland was not informed that the allegations of falsification came predominantly from anonymous sources or that Hester had allowed white employees to correct their timesheets. Despite this, it is clear from Gilland's testimony that he initially thought that Burns may have made a mistake on his timesheet and directed Hester to send the email to the PAs asking

them to resubmit their overtime hours. The record does not, as Burns contends, warrant an inference that Hester's email was intended to "trap" Burns into "justify[ing] his termination" by ensuring that no other employees made timesheet errors the week of January 6, 2014. At most, the record—viewed in the light most favorable to Burns—supports Burns's argument that the email's text did not clearly explain the need for the PAs to review their timesheets and verify that they had submitted the correct number of overtime hours.

Finally, Burns contends that "Miller and Gilland contradict themselves and each other" by claiming that Burns's "response to Hester's intentionally cryptic email was his missed opportunity to correct his time sheet." To the extent that Burns suggests that Miller and Gilland testified that Burns's response to the email was his *only* opportunity to correct his timesheet, both stated that Burns could have fixed the error by responding to the email *or* by admitting the mistake in the January 16, 2014, meeting. The fact that the email did not explicitly request that the PAs "double check" their timesheets does not lead to the conclusion that Burns did not have the opportunity to make a correction in the event that he discovered an error. It is undisputed that Burns continued to assert that his timesheet was correct even during the meeting, but he "conceded that he could have made a mistake" once "questioned" by Miller and Gilland. Based on the available evidence, including

Burns's timesheet, the gate logs showing he did not return to work on January 8, and Burns's "conduct in the [January 16] meeting," Miller and Gilland concluded that Burns had been dishonest.

In sum, Burns has provided no evidence that either Hester or Miller was motivated by some racially discriminatory animus that caused Mayfield to terminate Burns. *See Staub*, 562 U.S. at 422 (holding that employer is liable under "cat's paw" theory of liability if supervisor's act "motivated by [discriminatory] animus" and "intended by the supervisor to cause an adverse employment action," if the act was "a proximate cause of the ultimate employment action"). Moreover, nothing in the record suggests that Mayfield, Miller, or Gilland possessed anything other than a good-faith belief that Burns had falsified his timesheet. *See Winborn v. Supreme Beverage Co.*, 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If an employer terminates an employee 'because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not because of race.'" (quoting *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987))). As such, Burns has not demonstrated a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at

1328. Summary judgment is thus due to be granted in favor of Alabama Power as to Burns's race discrimination claim.

## B. Retaliation Claims

### 1. Prima Facie Case

A plaintiff successfully establishes a prima facie case of retaliation if he demonstrates that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012). Alabama Power first argues that Burns has not engaged in statutorily protected activity because he complained only to Hester that he had suffered racial discrimination by being denied overtime. A plaintiff employee who has made an informal complaint that an employer engaged in unlawful employment discrimination has engaged in statutorily protected activity. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). Such an informal complaint must be made to the employee's "superior" so as to provide notice of the discrimination to the employer. *See Shannon v. Bellsouth Telecommc'ns, Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) ("Title VII protects not just 'individuals who have filed formal complaints, but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'").

Viewing the evidence in the light most favorable to Burns, and keeping in mind that the plaintiff employee's burden to establish a prima facie case is "not onerous," *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) (per curiam), Burns has shown that he engaged in protected activity. While Alabama Power argues that Hester was not Burns's supervisor, this Court assumes that Burns made an informal complaint to a supervisor. As a new employee, Burns understood from his training that Hester was in charge of scheduling at the plant, and his complaint related to scheduling of overtime. It is unlikely that Burns, having worked at Plant Gorgas for fewer than two months at the time of his complaint, would have known that Hester was an hourly employee and that she did not supervise any other employees. He knew that Hester prepared his schedule and that she was involved in overtime callouts. Under these particular circumstances, Burns has established the first prong of his prima facie case.

Alabama Power also contends that Burns cannot show causation because neither Miller, Gilland, nor Mayfield knew that Burns had complained of racial discrimination. In order to establish a causal connection between an employee's protected activity and an adverse employment action, "a plaintiff must show that the relevant decisionmaker was aware of the protected conduct" at the time the decision was made. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013)

(internal quotation marks omitted). Because it is undisputed that Hester did not inform Mayfield—or even Miller or Gilland—that Burns had complained of race discrimination in the January 5 overtime callout, Burns has not established a prima facie case of retaliation. Burns's contention that he "gave management sufficient notice that Hester was treating him unfairly so that an investigation was required" is unsupported by the record.

Nonetheless, as with his race discrimination claims, Burns appears to rely on a "cat's paw" theory of liability to prove the causation element of his prima facie case. To the extent that Burns contends *Staub* controls with regard to his retaliation claims, *Staub* is inapplicable because a retaliation claim "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)). The *Staub* standard, by contrast, applies only to Title VII causes of action that require the plaintiff to show "that the discriminatory animus was a 'motivating factor' in the adverse employment decision." *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1336 (11th Cir. 2013) (holding that *Staub* is inapplicable to claims under the Age Discrimination in Employment Act because plaintiff is required to prove "but-for" causation).

Instead, to apply a "cat's paw" theory of liability with respect to his retaliation claims, Burns must show that Hester's racially discriminatory animus "ha[d] a determinative influence" on Mayfield's decision to terminate Burns. *Id.* at 1335–36. This means that "when the person with the unlawful animus is not the decision-maker, the actual decision-maker must have acted in accordance with this person's decision, without the actual decision-maker himself evaluating the employee's situation." *McShane v. U.S. Attorney Gen.*, 144 F. App'x 779, 791 (11th Cir. 2005) (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)); *see Llampallas*, 163 F.3d at 1249 (suggesting that "cat's paw" liability applies where the decisionmaker "is a mere conduit for the harasser's discriminatory animus" or "tacit[ly] approv[es]" the harasser's decision).

Burns argues that Hester "had a motive to retaliate" against him and points to the "strange and highly irregular investigation" she and Miller conducted as evidence that Burns was specifically targeted for termination. But even assuming that Hester did hold some kind of retaliatory animus against Burns for complaining to her that the overtime callouts were racially discriminatory, she was not involved in Alabama Power's inquiry into the falsification allegations after she sent the January 15 email at the direction of Miller and Gilland. Mayfield received a copy of the email and Burns's response to it, but she did not independently speak with

Hester before making the decision to terminate Burns. Moreover, even if Hester had not informed Miller of Pate's allegations against Burns, Miller could nonetheless have initiated an investigation because a PCO telephoned Miller to report that several PAs had accused Burns of falsifying his timesheet. Given these facts, Burns has not established that any desire Hester harbored to retaliate against him "ha[d] a determinative influence" on his termination. *Sims*, 704 F.3d at 1335–36. Thus, he fails to demonstrate a prima facie case of retaliation.

### 2. Pretext for Retaliation

Even assuming that Burns has established a prima facie case of retaliation, he has provided no evidence that Alabama Power's proffered reason for his termination—that he falsified his timesheet—is unlawful pretext for retaliation. Where, as here, the employer articulates a legitimate, nondiscriminatory reason for an adverse employment action, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason[ is] a pretext for discrimination." *Alvarez*, 610 F.3d at 1264. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Kragor v. Takeda Pharmaceuticals Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256). "When a plaintiff

chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* at 1310–11 (internal quotation marks omitted). A mistaken belief that the employee violated company policy is not pretextual if the belief is held in good faith. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

In support of his retaliation claims, Burns makes many of the same arguments as with respect to his race discrimination claims. First, Burns argues that Hester retaliated against him by failing to address his complaint of racial discrimination in overtime; however, it is undisputed that Burns worked overtime on the day he complained and on the next day, and Hester called him out the day after that, but he did not return to work. As Alabama Power points out, this is precisely the *opposite* of retaliatory conduct.

Burns also claims that Hester should have directly notified him about the error on his timesheet and that she and Miller "targeted" him through the investigation. As described above, Burns's situation was approached differently because his co-workers alleged that he recorded hours that he did not work. Burns is therefore unlike other employees who may have coded their time incorrectly and fixed the mistake. Further, Burns presents no evidence that Hester had a retaliatory motive in informing Miller about Pate's allegations, and Miller already knew about

the allegations prior to speaking with Hester. Hester's only other involvement in the investigation was to send the January 15 email at the direction of Miller and Gilland. The text of that email does not imply that Hester acted in retaliation to focus the investigation "solely on [Burns]" or to "demonstrate [that] he violated a work rule without regard to context." Rather, Gilland testified that he asked Hester to send the email to all the PAs because he believed that Burns may have made a mistake due to the irregular hours, and other employees may have made a mistake as well. Because Burns has presented no evidence that retaliation was the "real motive" for Alabama Power's decision to terminate him or that its belief that he violated a work rule was not made in good faith, summary judgment is due to be granted in favor of Alabama Power as to Burns's retaliation claims.

## IV. Conclusion

For the reasons stated above, Alabama Power's Motion for Summary Judgment (Doc. 19) is due to be GRANTED. A separate order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on April 24, 2017.

L. Scott Coogler
United States District Judge

186289